Good morning, Your Honors. Steve Shadowin on behalf of the plaintiff's appellants. I'd like to reserve three minutes for rebuttal. I'll try to help you watch the clock. Thank you. Your Honors, in light of this court's recent decision in Rodriguez v. Swartz, I believe that there are four issues remaining in this appeal for decision. Whether or not the United States has sovereign immunity for the claims against it in its own courts, for claims that it violated the Jus Coghan's norm against extrajudicial killing, whether or not the plaintiffs are entitled to equitable tolling of the statute of limitations on their FTCA claims, whether or not there is a viable Bivens claims against one of the defendants, former Chief of the Border Patrol, Michael Fisher, and whether or not the other defendant, the agent who pulled the trigger, Agent Diaz, was entitled to summary judgment on the question of the ATS immunity. I'll, of course, do my best to answer any questions the court has on any of those issues, but if I had my druthers, I'd devote the bulk of my time to the question of the ATS immunity. With respect to whether or not the United States has sovereign immunity to a claim of Jus Coghan's violation litigated against it in its own courts, there are three undisputed propositions that we start with. Could you actually help me back up a bit and explain your view of the facts in this case and how it affects this ATS claim? Because I'm very confused about whether you're saying that your client was throwing rocks or not throwing rocks, and how the rock policy affects your view of the facts. From your brief, I couldn't tell whether you were saying there was no rock throwing or there actually was rock throwing, and somehow the ATS claim is based on a policy about rock throwing. So the ATS is fundamentally premised on the unlawful policy of the Border Patrol that agents were entitled to treat the throwing of rocks at them as per se lethal force that then justified the agent to use a deadly force in return. We say that in the evidence... So your claim requires there to have been a policy, and do you need it to have been followed in this case? Because you also sort of say he wasn't throwing rocks, I think. Right. But our expert says, and we contend, that there are two aspects to the rocking policy. One, in instances where rocks were thrown, the direct effect of the policy was to, in effect, authorize the agents to return fire to shoot to kill. The other aspect of that policy was that it encouraged agents to falsely claim that rocks had been thrown. So your view is that somehow this report that the agent needed backup because of rocks, you discount that as somehow having been shoehorned in after the fact? It's not that we contend that it was shoehorned in after the fact. In fact, the audio tape, I will tell the court, the first time this issue appeared was in the government's brief on appeal. As an officer of the court, I will tell you that the audio tape, the first time that there's a mention of rocks being thrown or being involved in any way, was after the shots were fired. How do we know that? How do you know that? There are audio tapes. So the discussion of the audio tape that I could find was at ER 897, and it requesting assistance and saying that there are rocks being thrown. Are you saying he asked for assistance and said rocks were being thrown after the person was dead who was supposedly throwing rocks? There's an OIG report that is ambiguous as to the timing. The report is ambiguous, but ER 897 doesn't seem ambiguous. So there's the report, but there's the contemporaneous discussion, it seems. The description at ER 897 doesn't seem ambiguous. It says that Castro called, and there's an audio recording, sorry, not Castro, that Diaz called requesting backup and saying rocks were being thrown, and that that's what the recording says. Yeah, if that's what that says. I was looking at 813, which is what the government cited in its brief, and that is ambiguous because it says further review of the radio communication did capture audio of Diaz requesting assistance at Stewart's Bridge and reporting that rocks were being thrown. That is ambiguous the way it is written. How is that ambiguous? How is that inconsistent at all with what's on 897? How does it become ambiguous? I'm sorry, I'm not familiar with it. So 897 says it captured audio of Diaz requesting assistance at Stewart's Bridge and reporting that rocks were being thrown at them. This is the declaration that describes the audio recording to the court. So unless you think this person who was describing the audio recording lied about what the audio recording said, I don't understand where the ambiguity is. Well, from what you read right there, it doesn't give the timing. He says that... But why would you, I mean, I mean, unless the whole call is fake, is that your allegation that Diaz killed your client and then called and said he's throwing rocks, I need help? The audio tape, I'm telling you as an officer of the court, the first time there is a mention of any rocks being thrown was after the shots were fired. How, but so you hear the shots? What makes you say that as an officer of the court? I don't understand what the basis of saying that is. That we've, we have the audio tapes and we've listened to them. That there's a, there's a description of shots. Are those part of the record on appeal? No, they're not. They're not because... As part of the record on appeal. Because the government never raised this issue of the, of their contention that there was a quote, contemporaneous... You could have asked for supplementing the record once they raised it, right? Let me just move on from this because I think we understand the general flow. My question really goes to the Ninth Circuit case of Tobar. Sure. Because when we're looking, whether it's rock throwing or your view that he had a telephone, a cell phone for videoing in his hand, the question is the immunity of the United States and we have Tobar. So that's obviously precedent that you need to overcome in, along with other general precedent with respect to waiver of sovereign immunity. So I'd appreciate your view on that. Sure. In Tobar, there was no claim of a Juice Kogan's violation. It's really as simple as that. The court, you look at the facts of the case and what the claims in Tobar were, they were negligently stopping this ship at sea. There's no claim of any Juice Kogan's violation whatsoever. The Tobar case itself does not discuss or address the question of, you know, what, whether there's sovereign immunity when this is a Juice Kogan's violation. The court, the cases that Tobar relies upon, none of them addressed whether there was a sovereign immunity in the face of a Juice Kogan's claim. So it simply was not at issue in that case. But it, although it may not have been at issue, the language is pretty clear. Is it not? The, there is, there is a broad language. There is no waiver of sovereign immunity under the statute. Under the statute, but it's given that there, the issue simply was not presented or addressed in that case. So yes, there is, there is a broad language, but I must say, although the language is broad, it's a very, it's not a detailed analysis. The entire analysis of whether. That all the time. Like the statement is made and we're bound by it. And then counsel comes in and said, but they didn't really analyze it too much. And we say, well, it's not really, and we're sort of in the, where we take the cases as we find them. It was the whole, the whole analysis is two sentences and it did not address a Juice Kogan's claim, which is what makes this case different. And your position is that Juice Kogan's claims don't need a waiver because there's never sovereign immunity for those types of claims. Well, never sovereign immunity for those types of claims against the sovereign litigated against it in its own courts, those are the conditions. That's correct. Unless Congress has expressly granted immunity. That's correct. If Congress purported to expressly grant immunity in a case like that, you'd have yourself a really difficult case here. It's the opposite. Think about what the ATS does. Congress granted a tort claim against the United States for violation of a norm whose defining characteristic is that it binds the sovereign regardless of its consent. So it would literally be a contradiction in terms. How do we know that that's what, I mean, so this Juice Kogan's concept as part of ATS, I mean, that's not really what SOSA talks about, right? SOSA talks about not Juice Kogan's, it talks about piracy and ambassadors. So, so are you assuming that all Juice Kogan's violations are part of ATS and what is your authority for that? So it is not our position that every Juice Kogan's claim is automatically actionable under the ATS. Our position is that the Juice Kogan's norm of extrajudicial killing is, and we cite in our brief, a whole raft of cases, including the Rio Tinto case in this circuit. I already went to the Supreme Court once and got reversed on the ATS, so I'm And what the Supreme Court did do was, of course, save the ATS as a statute, but as a jurisdictional statute. So now, I mean, that's what they said it is, a jurisdictional statute that gives you the right to come into the U.S. court as an alien under that statute. So they also said, of course, we, maybe they didn't limit it to piracy, but they were pretty clear. So it's hard for me to understand completely why you assume that there's a waiver of sovereign immunity, because an ATS claim doesn't have to be against the government. It doesn't have to be against the government. In which case, I don't know why, you know, you have private actors who do bad things, you have governments who do bad things, but I'm not sure why on its face you would assume there's sovereign immunity when that statute is actually meant to cover both private and government actors. Well, to the extent that it covers government actors, it's Congress giving a tort claim against the government actor to enforce a claim whose defining characteristic is that it binds the government regardless of its consent. So to say that you can't sue the United States because they don't consent would literally be to contradict the statute. And with respect, Your Honor, in SOSA, the Supreme Court went a little bit further than what you described. They said it provides jurisdiction and authorizes the federal courts under federal common law to enforce, as federal common law, a limited number of international norms. And both before and after SOSA was decided, the courts of appeals have said that the rule under the ATS is the norm against extrajudicial killing. Do you have a definition of extrajudicial killing? How do we know that this is an extrajudicial killing? It was not contested by the government for purposes of this appeal. So we start by listing three propositions that are uncontested. One. Are there facts that you need to show, though, that, I mean, if this case proceeds, what will you need to show factually for this to be an international law as a Juice Kogan's violation? We have to prove the existence of the policy. And so... And how do we know that international law says that a policy of shooting someone, throwing rocks at a border is an international law violation? Is there something in international law that tells us that is established? Yes. There are lots of international sources of authority that say that a policy like that or a practice like that, or even in certain circumstances, a single instance of that is an extrajudicial killing. And the United States itself has been one of the foremost proponents for the last 40 years of the fact that that... But is the last 40 years enough or do we need to know when ATS was passed, whether that was considered a violation of international law? I mean, the way SOSA deals with this, it's like something that's been established forever and never could have been contested. So how do we know that this kind of factual situation is in that category? So SOSA was clear to say two things. One, it's not limited to just the three original types of claims, but it says to apply the modern law, international law, to enforce norms that are like those in the sense that they are definite, concrete, universally accepted. And again, for purposes of this appeal, the government has not contested that the norm against extrajudicial killing is an enforceable norm under the ATS, nor have they contested that the complaint adequately alleges that this policy violated that norm. And remember the procedural posture we're in here is the ATS claim was dismissed on a motion to dismiss the complaint. So it's the allegations of the complaint that prevailed. Thank you. Thank you, Your Honors. I'm being pleased to court Mark Stern from the Department of Justice for the defendants. I'm happy to deal with any of the issues raised. Do you contest that the complaint alleges an extrajudicial killing? Your Honor, we haven't on appeal taken a position on that. I'm reluctant. It's very hard for me to imagine that we would agree. I just don't, I'm just very reluctant to take any positions that we haven't totally thought through, but I have no reason whatsoever to understand this as falling within the limited scope of what's understood to be a judicial killing. But the real point and the reason we haven't addressed it is that it is so clear that a claim under the ATS cannot proceed against the United States. That's the explicit holding of Tobar plaintiffs invoke the alien towards statute, this court in Tobar said, consistent with the Supreme Court's decision and Sosa said, no, you can't do that. But what do you do with the language in Sala from our court that says that international law does not recognize an act that violates juice Kogan's as a sovereign act? And we, if we, well, okay, let me just stop there. How do you deal with that language from Sala? Um, I think I deal with it by looking both at, um, Sala and, um, at this court's subsequent decision on, no, I'm going to get all the pronunciations of these names wrong in, um, survive where the court was. I mean, first of all, in Sala involves, um, just been just so I don't get these confused. Um, the, um, Sala, the court says that Cederman compelled the conclusion that Congress could provide official immunity and that Congress could, but, um, that leaves an, I mean, that doesn't address what it is in the absence, right? So in the absence, they're arguing juice Kogan's violations in the absence of any act by Congress don't have sovereign immunity because they, by definition can't. And I don't, I haven't found any case from our court that says that's wrong. I'm not sure that it's not an open question. I mean, Tobar says that you need to have an explicit waiver of immunity. I mean, that's, that's always true. I mean, there's, there's no case. Tobar is not dealing with the juice Kogan's violation. So it's not clear that it meant to be addressing this issue. No, but if you're trying to assert a use Kogan's violation, there's no other claim. I mean, the Westfall act and the FTCA don't specifically talk about use Kogan's violations. The court just went, look, you know, that the, you can't bring the fact that you're alleging a use Kogan's violation does not alter the scope of official immunity. And the court said, if we needed an explicit statement by Congress in the context of the foreign sovereign immunities act, how much more clear it would be that we need that kind of a statement with regard to official immunity. Let me ask you on that. Um, if you look at the fourth circuits case and use of their proposition, as I understand it, is that when you have a use Kogan's violation, then it doesn't merit foreign official immunity. Do you think there's any distinction between that analysis of foreign official immunity and domestic sovereign immunity as applied to the U S yes. The, and Joseph, if I'm remembering cemetery correctly, cemetery was a former head of state and there's well-developed case law that says about when a foreign, a former foreign head of state may or may not, um, get immunity and the fourth fully disagreed with the fourth circus analysis and Samatar, but it's totally distinguishable from this dealing the considerations that go into assessing whether a foreign head of state has immunity for alleged use Kogan's violations, as opposed to whether the United States has and whether Congress has intended them, because that's really the ultimate question. Has Congress intended to make the United States libel for certitude Kogan's violation when, when a plaintiff bring sort of asserts a claim under, um, the alien tort statute where the Supreme court and this court have made clear that there is no waiver of immunity and where this court and court have always recognized that if you want to bring a claim against the United States, there has to be an explicit waiver of sovereign immunity and there is no such thing. I mean, I'm trying to think as a practical matter, if you need explicit waiver of sovereign immunity and it only applies to international, certain international law violations, does it in effect almost limit the alien tort statute to private violations? I think it largely does. Um, the certainly, unless the United States indicates that there is some kind, and this is not peculiar to international law, I mean, the same holds true in domestic law, you can have, even where you have a waiver of immunity, I mean, it's not discussed in our briefs, but there's a decision from the Supreme court involving in a case called Flamingo involving the postal service. There was a waiver of immunity. The Supreme court says not even though there was a waiver of immunity, you still have to look to see whether Congress meant that particular statute, which in that case was the antitrust laws to be applicable to the United States. So even where you could get by that threshold claim, there's still a second claim, but here you can't get a second point that you've got to clear here. You can't get by that first point. If Congress chose to waive the United States immunity for use Kogan's violations, it could say so. And then you could take that waiver in combination with the alien tort statute and you could proceed. So their theory is that just by incorporating juice Kogan's violations or some of them into the ATS, you don't need a waiver of immunity because it's fundamental in the concept. So do you have a case that actually says that that's wrong, that considers a juice Kogan's violation and says that there's immunity absent any other act for the United States? Um, I don't, I mean, I've got all the cases say that you need for, to come up under anything, say you need an explicit waiver. We do have the Celia case that talks about official immunity. We've got Cedermans talking about the foreign sovereign immunities act. We don't have, we've got the Supreme court saying. Cederman is not an ATS case, correct? Um, no, that's foreign sovereign immunities. And the point that was then made in Celia was that if you've got the foreign sovereign immunities act meeting an explicit statement by Congress to assert a use Kogan's violation, how much more true is that going to be for official immunity? So I don't, I don't think I've got a case that stands for the explicit proposition of what happens when you invoke the alien tort statute against the United States and say, use Kogan's. But if you take everything else together, I think it's pretty much a hundred percent clear that you can't do that. And the arguments to the contrary are really without any authority of any kind. And they really defy settled doctrine. If we disagreed with you, have you offered any other defense at this point to this claim? No, not on this appeal. Your Honor, we would have to do that. What would we do if we disagreed with you on this point? I imagine that assuming we didn't seek further review, the case would go back to district court and we would then litigate the merits of a use Kogan's claim, um, which just the idea of what that would entail should itself counsel against this kind of a conclusion. But, you know, again, if the court were to say, yep, you can, there's a waiver of immunity and Congress meant to make use Kogan's violations applicable to the United States and the Supreme Court didn't disagree, then it would be in district court for the district court to decide. So you don't mean there's no motion to dismiss and you'd start through the normal summary judgment of discovery? Well, we'd have to either go back and move in the alternative for motion to dismiss or summary judgment. I, I, I don't know what the... Because are, are there other legal questions? I mean, it feels a little bit odd to have this big question about immunity and use Kogan's when it's not even clear what the government's position is on whether the allegations even alleged use Kogan's violation anyway. We never had to take a position to address. And I should say, I haven't come through the papers to see if we ever took a position on it. So I don't, I don't want to speak out of turn. It's just, this one is just so clear that we don't think it's a, you know, respectfully, we don't think that this is a big question. We think this is settled law and plaintiff can say it's all we can assert use Kogan's, but there's nothing anywhere. You know, there's no authority for it, you know, and there's so much authority against it that I really don't see this as adding anything to the world as it is revolutionary to conclude that you could assert use Kogan's violations against the United States and that that's something that the Alien Tort statute permits. I mean, that really would be extraordinary. And that's why we've litigated the case the way we have. And I'm happy. I'm sorry, Your Honor. Ask a question here. I'm assuming what you say is true. Is there no relief for this appellant? Um, that's correct, Your Honor. There is not always relief. Um, and the Supreme Court has made that clear in a number of contexts. And the appellant raises the issue of Bivens. What do you have to say about that? Um, I'm glad you asked your honor, because I did want to talk about Bivens both with respect to the qualified immunity analysis and perhaps your question goes to the, um, to the predicate question of whether a, a remedy should even be inferred. And I just wonder, cause this was not briefed since, um, the courts Rodriguez, um, decision came out subsequently to the briefing in this case, but as we indicated in our 28 J letter, we think that the decision in Rodriguez is not dispositive here of the question, whether a Bivens remedy should be implied, um, the court on the contrary in Rodriguez, um, specifically said, makes reference to, um, say foiling violence smugglers, um, saying that it would be frivolous to suggest that a Bivens remedy could be implied there. I think that's eight 99 F third is seven 44. And the court repeatedly rejects arguments about the reasons for not implying a remedy by saying that there just is no conceivable legitimate purpose. It says, no one suggested national security concerns involve shooting people who are just walking down a street in Mexico. And in this case, extending Bivens would not implicate American policy because there's no American foreign policy embracing shootings like this one, you know, or they've identified no duty that would embrace shootings like the one pleaded here. And the court is also very clear to say that when we look to special factors, we do it in the specifics facts alleged in the complaint, not cross borders, shooters, shootings generally. So this court's decision in Rodriguez does not mean that this case is disposed of and what we have here, is it the government's position that this incident occurred in the United States? It occurs at right. I mean, a lot of the relevant action takes place within the United States. The Mr. Young is at the time of the shooting is just right smack at the border on the border fence. Under the federal tort claims act, if he's at the border fence and then when he fell, he straddles the two jurisdictions. Does that mean that the foreign exception would not be invoked in the tort claims? The agency concluded that it was a foreign country exception and denied the administrative claim on that basis. I understand the plaintiffs disagree with that, but that's not been, that's not an issue. That's been briefed here. If it's an issue when we say, you know, as Judge Gaitan says, you have an agent who is a person at the border, shoots him dead. Is there no remedy in US courts for this? And then you say no, but the question is, maybe there was a strategic decision on the timing of the federal tort claims act, but it would seem to me hard to invoke that foreign exception and maybe that was wrong to have done that given the proximity at the border, so it seems like the answer should have been, and maybe I'm misunderstanding, yes, there is a claim. It's a foreign, you can file under the federal tort claims act, but then you've got to get into the procedural timing and substance. Well, that may be the case, Your Honor. If, assuming that this wasn't, that the agency aired, plaintiff had every opportunity to dispute that on appeal. But isn't this relevant to the Bivens issue? I mean, I would expect you to say there should be no Bivens remedy because there is another remedy, this happened in the United States and it's an FTCA claim. But you seem to be not wanting to say that. The reason I don't want to say it, Jemima, I'd like to say it, but I can't say it because of the Supreme Court's decision in Carlson versus Green, which indicated that the availability of a Bivens remedy didn't preclude the, excuse me, the availability of an FTCA claim didn't preclude the implication of a Bivens remedy. Now that's a long time ago. It's very doubtful that the Supreme Court would have indicated an Abbasi would come to the same conclusion now, but we don't think that that itself is squarely an argument. We do think that the design of the FTCA strongly suggests that a remedy shouldn't be implied here. You know, this is core border protection. This, you know, we're right at the border. You know, we can argue about, you know, the, you know, well, you know, what about the facts of this case, but protecting the border and the considerations applicable at the border are both a new context and they do implicate national security concerns. This is a Bivens argument, not an FTCA argument, right? Right. Now the FTCA is, other than the fact that this is, the FTCA was clearly waived by, I mean, and even remember their first suit, like when they finally filed suit at all, it's already past the time when a Bivens claim, like it sounded like, like, I mean, I think it would be sort of out of time no matter what, but by the first time they got the court to assert their Bivens claim, the time for passing, for filing the FTCA suit had already passed. So they can come in like out of time and say, by the way, the reason I wasn't here earlier is because I was thinking about filing this suit and then I was worried what would happen if my claim got denied, but there's not a case in the world that suggests that that falls within any kind of equitable tolling doctrine and contrasts it remarkably, say, with a case like Wong, where this court was at pains to point out that Wong had done everything possible and correctly at every point, and the fact that her claim was untimely was no fault of hers, and see, I've run out, I think I've run out of time. Thanks. Just very briefly, Your Honor, so I want to touch on the Charming Betsy canon of construction. The Charming Betsy says that a court may construe federal law, whether state or whether statutory or common law, to conflict, cannot construe federal law to conflict with international law, quote, if any other possible construction remains. That's the standard. So yes, there's a canon of statutory construction that says, generally, you don't construe statutes to waive sovereign immunity. There's an offsetting canon of construction here, the Charming Betsy canon, and the Supreme Court has repeatedly made clear that the sovereign immunity canon of construction is just that. It's one of a number of tools in the toolkit for construing federal law. The other tool in the toolkit that's applicable here directly is the Charming Betsy. The ATS deals with international law. Charming Betsy deals with international law. The ATS, the court said in Sosa, Congress enacted the statute to assure the world that the new republic would govern itself consistently with international law. And so I think that clearly the directly applicable canon of construction here is the Charming Betsy. Thank you, Your Honors. It's been well briefed. I think we have the arguments in mind. It's obviously a very interesting and difficult case. So I want to thank both counsel for your argument and also for the very good briefing in the case. Thank you. Your Honor, we request permission to lodge that audio tape with the court in a supplemental filing. You're welcome to do that and file a motion for supplementing the record. Thank you. The case just argued of Quintero Perez versus the United States is
judges: McKeown, Friedland, Gaitan